19 F.3d 21
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
DACOR CORPORATION, an Illinois corporation,
Plaintiff-Counterdefendant-Appellee,
v.
SIERRA PRECISION, a California corporation,
Defendant-Counterplaintiff-Appellant.
 No. 93-2708.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 19, 1994.
Decided March 14, 1994.
Rehearing Denied April 7, 1994.
 
 1
 Before CUMMINGS, Circuit Judge COFFEY, Circuit Judge EASTERBROOK, Circuit Judge
 
 ORDER
 
 2
 In a two-count complaint, Dacor Corporation, an Illinois corporation ("Dacor"), sued defendant Sierra Precision, a California corporation ("Sierra"), alleging breach of contract (R. 1 at 1, Complaint Count One) and breach of implied warranty of merchantability (R. 1 at 4, Complaint Count Two). Diversity jurisdiction was asserted under 28 U.S.C. Sec. 1332. After Dacor voluntarily dismissed the breach of contract claim, the remainder of the case proceeded, by consent of the parties, before Magistrate Judge Gottschall. Sierra then filed a counterclaim, alleging that the parties had reached an accord and satisfaction of their dispute and that Dacor had breach that agreement when it filed suit (R. 35 at 7, Answer and Counterclaim). Sierra prayed for its attorneys' fees and administrative costs as consequential damages (id. at 7-8). After a two-day trial, the magistrate judge awarded Dacor $136,721.78 on its breach of warranty claim and dismissed Sierra's counterclaim. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. Sec. 636(c)(3).
 
 Facts
 
 3
 Dacor manufactures and sells a breathing apparatus denominated a regulator, which is inserted into divers' mouths and connected to air tanks that are transported under water on divers' backs. Since at least 1979 Dacor has purchased from Sierra hoses and hose assemblies that serve to connect the regulator to the air tank. Dacor sells these products to go with its regulator. Before 1985 the hose assemblies were constructed by Sierra with a 3/8" thread on the male end and an internal diameter of .190". This male end contained a fitting machined from one piece of metal, and Dacor apparently had never experienced problems with it.
 
 
 4
 In 1985 Dacor learned that a competitor, U.S. Divers, was marketing and selling a larger internal hose and hose assembly on its equipment. The larger internal diameter--at that time .201"--of those products would allow divers' air to flow more freely from the tank to the breathing apparatus. These hoses and hose assemblies were also manufactured by Sierra. Dacor therefore asked Sierra whether it could manufacture a hose and hose assembly with an internal diameter as large or larger than that of U.S. Divers, specifying its preferred internal diameter to be .250".
 
 
 5
 Sierra then forwarded to Dacor samples of the hose and hose assemblies that it was manufacturing for U.S. Divers. They differed from those being manufactured for Dacor as follows: (1) The U.S. Divers hose assembly then being manufactured by Sierra was a two-piece hose assembly in contrast to the one-piece assembly being manufactured for Dacor, and (2) the U.S. Divers samples had a greater internal hose and assembly diameter. Sierra informed Dacor that it could not safely make a hose assembly with a .250" diameter, but offered to make one with a .234" diameter. Dacor agreed. Later Sierra requested a change in the internal diameter to .230", and Dacor agreed. Sierra thereupon incorporated the new hose and hose assembly diameter into its two-piece hose assembly design, and filled several of Dacor's orders for the new product, which Dacor then sold as accessories for its regulator.
 
 
 6
 By the fall of 1986 approximately twelve of the new hose assemblies had been returned to Dacor by consumers or dealers on account of cracking or shearing in the two-piece male fitting to the hose assembly. The shearing always occurred at the gap between the two pieces of metal in the male fitting to the hose assembly. Sierra then conducted laboratory tests that confirmed that the two-piece assembly was subject to breakage. Because any failure of the hose assemblies during an actual dive could be life-threatening, Dacor and Sierra agreed that Sierra would redesign the fitting for the hose assembly and that the parties would conduct a recall of the defective product. Sierra redesigned the fitting so that the male end would be machined from one piece of metal, as it had been prior to the new design. Thereafter no failures of the redesigned hose assemblies were experienced by Dacor's customers.
 
 
 7
 During the recall, the details of which were negotiated at a meeting between the parties on July 8, 1987, Sierra replaced all remaining two-piece hose assemblies still in Dacor's possession with the new one-piece design. It also supplied replacement hose assemblies to be provided to customers pursuant to the recall. In so doing Sierra incurred approximately $141,000 in expenses. Dacor conducted the administrative side of the recall, and incurred $136,721.78 in expenses for notice to customers and in shipping the new hose assemblies. The dispute between the parties centers on responsibility for the costs of the recall: Dacor contends that Sierra is liable under the Uniform Commercial Code for breach of implied warranty of merchantability, thereby making Sierra liable for the recall costs, while Sierra contends, first, that it is not liable for breach of an implied warranty, and second, that the parties reached an accord and satisfaction whereby it was agreed that each party would assume the costs of its own portion of the recall.
 
 Magistrate judge's findings
 
 8
 The magistrate judge found that an implied warranty of merchantability had arisen when the parties contracted for Dacor to purchase the two-piece .230"' internal diameter hose assembly from Sierra, and that the warranty had been breached when the product proved to be susceptible to cracking and shearing. She rejected Sierra's argument that the implied warranty of merchantability was excluded from the contract. She also rejected Sierra's contention that the parties had reached an accord and satisfaction concerning the costs of the recall.
 
 Analysis
 
 9
 To state the applicable standard of review is to dispose of this case: "Findings of fact ... shall not be set aside unless clearly erroneous...." Fed.R.Civ.P. 52(a). A finding is not clearly erroneous if it is "plausible in light of the record viewed in its entirety...." Anderson v. Bessemer City, 470 U.S. 564, 573-574. In this case the magistrate judge correctly applied the law to the facts as she found them, and her fact-finding is amply supported by the record. Therefore we affirm.
 
 1. Implied Warranty of Merchantability
 
 10
 The applicable provision of the Uniform Commercial Code adopted in Illinois provides: "Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 ILCS 5/2-314(1). The parties do not dispute that Sierra is a merchant with respect to the hoses and hose assemblies. "Goods to be merchantable must be at least * * * fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2-314(2)(c). The parties are also agreed that "The ordinary purpose of the low pressure hose assembly is to convey air from ... the regulator to ... the mouthpiece.... * * * Regulator hose assemblies and their fittings ... should not crack or shear during ordinary use." (R. 57, Schedule A at 3-4, Statement of Uncontested Facts paragraphs 15, 16.) From this it would appear that Sierra's two-piece internal diameter .230" hose assemblies were not fit for their ordinary purpose, since they did crack and shear. Sierra argued that Dacor's design mounted the hose assemblies to the regulators at an unusual angle that made cracking and shearing more likely, suggesting that they had not been put to their ordinary use. The magistrate judge noted, however, that "[t]here is no evidence suggesting that these hose assemblies were subjected to anything other than normal use," S.A. 14, and she rejected Sierra's claims regarding the angle of mounting since Sierra's only evidence to support this claim was the testimony of its president, a non-expert. Because Sierra had not introduced competitors' regulators into evidence, nor provided any proof that the unusual mounting, if indeed it was unusual, had any causal connection to the assembly breakage, she found that "the contention that Dacor's design rendered its use of the hose assembly other than ordinary was supported by nothing in the record." S.A. 14.
 
 
 11
 The record therefore supports the magistrate judge's determination that Sierra's product was not fit for its ordinary purpose. Sierra, however, contends that any implied warranties of merchantability were excluded from the contract between the parties, first, because Dacor provided precise and complete specifications to Sierra for the hose assembly, and second, because Dacor inspected the fittings before purchasing them. It is true that an implied warranty of merchantability may be excluded when the buyer has given precise and complete specifications to the seller, U.C.C. Sec. 2-316 Official Comment 9, and it is also true that "when the buyer before entering into the contract has examined the ... sample ... as fully as he desired ... there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him," 810 ILCS 5/2-316(3)(b). In this case, however, the magistrate judge found that Dacor had not provided Sierra with precise and complete specifications so as to exclude any implied warranties of merchantability, nor was the defect in the hose assembly one which ought to have been revealed by Dacor's examination. S.A. 15, 18. These findings are supported by the record.
 
 
 12
 First, while Dacor did request a hose assembly similar to the one Sierra manufactured for U.S. Divers, this does not mandate an inference that Dacor was requiring a two-piece fitting simply because the U.S. Divers assembly had one. "With respect to both wall thickness and the two-piece design, Sierra bore substantial design responsibility." S.A. 17. For example, Sierra rejected Dacor's first suggestion of an internal diameter of .250", and later modified its own suggested internal diameter of .234" to .230". Sierra also initially supplied a sample assembly with a two-piece fitting. The record supports the inference that Dacor did not provide Sierra with precise and complete specification within the meaning of Comment 9 to U.C.C. Sec. 2-316.
 
 
 13
 Likewise, in regard to Dacor's inspection, while Dacor did inspect the sample assembly before entering the contract with Sierra, we agree with the magistrate judge that the defect was not one which ought to have been revealed by such an examination. "[B]oth companies, sophisticated and safety-conscious, failed to anticipate the possibility of a shearing failure or the need to subject the assemblies to a test under shearing forces." S.A. 18. This indicates that the defect was not one which Dacor ought to have discovered. "[L]atent defects [cannot] be excluded by a simple examination." U.C.C. Sec. 2-316 Official Comment 8.
 
 
 14
 Finally, we are not convinced by Sierra's argument that Dacor, because it was a professional buyer, assumed the risk of product failure. Comment 8 to U.C.C. Sec. 2-316 provides: "A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe...." For the reasons just given, this defect was not the kind which a professional seller of breathing apparatus ought to observe.
 
 
 15
 There was no error in the conclusions that an implied warranty of merchantability had arisen between the parties and that it was breached.
 
 2. Accord and Satisfaction
 
 16
 In addition to its arguments concerning the implied warranty of merchantability, Sierra argues that at the July 8, 1987, meeting between the parties, in which responsibilities for the recall were allocated, an accord and satisfaction was reached regarding the costs of the recall. It is clear that the parties agreed at that meeting that Sierra would provide the materials for the recall and that Dacor would conduct it. From this Sierra invites us to conclude that the parties agreed that Sierra would pay for the materials for the recall and that Dacor would pay for the costs of conducting the recall. In support of this Sierra notes that the two parties expended approximately the same sum of money in performing their separate tasks. The magistrate judge found, however, that there had been no meeting of the minds with regard to the costs of the recall. S.A. 10. No witness could remember any explicit settlement of the cost issue, or even any discussion of cost allocation. The record therefore supports her inference that no agreement on this issue was reached. As a result, Dacor is not barred by an accord and satisfaction from seeking recovery of its recall expenses on the ground that Sierra breached its implied warranty of merchantability, and Sierra is not entitled to damages for breach of any contract of accord and satisfaction.
 
 Conclusion
 
 17
 For the foregoing reasons, the judgment below is affirmed.